**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


**Charles Wrenn**

     **v.**                                    **Case No.   04-CV-344-PB**

**Jo Anne B. Barnhart, Commissioner,**
**Social Security Administration**


**MEMORANDUM AND ORDER**

Charles Wrenn moves to reverse the Commissioner of Social
Security's ("Commissioner") decision denying his application for
disability insurance benefits.  See 42 U.S.C. § 405(g).  Wrenn
argues that the Administrative Law Judge ("ALJ") failed to
consider the combined effect of his impairments, erroneously
interpreted the medical evidence, and did not properly consider
the effect of his subjective pain complaints.  The Commissioner
objects and moves for an order affirming his decision.  For the
reasons set forth below, I conclude that the ALJ's decision is
supported by substantial evidence.  I therefore affirm the
Commissioner's decision and deny Wrenn's motion to reverse.

## I. BACKGOUND[1]

### A.  Procedural History

Charles Wrenn filed an application for disability benefits on September 6, 1996, alleging that he had been disabled since February 11, 1991.  His application was initially denied on November 19, 1996, and denied again on reconsideration on March 11, 1997.  Upon Wrenn's request, a hearing was held before a Administrative Law Judge ("ALJ") Robert S. Klingebiel on June 25, 1997.  Wrenn did not appear at the hearing.

The ALJ issued his decision on September 9, 1997, finding that Wrenn was not disabled at any time through December 31, 1996.[2]  Specifically, the ALJ found that Wrenn retained the residual functional capacity ("RFC") to perform a significant number of jobs that existed in the national economy.  The Appeals

---

[1]  Unless otherwise noted, the background facts recited in this Memorandum and Order are drawn from the Joint Statement of Material Facts (Doc. No. 8) submitted by the parties pursuant to Local Rule 9.1.  Citations to the Joint Statement are in the form "Tr."

[2]  Because Wrenn acquired sufficient quarters of coverage to remain insured for disability insurance benefits ("DIB") only through December 31, 1996, he had the burden of showing that he was disabled on or before his insured status expired.  See 20 C.F.R. §§ 404.101, 404.130-404.131.

Council denied Wrenn's request for review on November 30, 1998.
Wrenn then filed a complaint in this court.  On July 6, 1999, I
remanded the case "for the purpose of obtaining additional
testimony and evidence which shows [Wrenn's] medical condition
through December 31, 1996, and to obtain testimony from a
vocational expert as to the extent to which [Wrenn's]
nonexertional limitations erode his ability to perform light
work."

On July 18, 2000, ALJ Klingebiel held a second hearing at
which Wrenn appeared and was represented by counsel.  A
vocational expert also testified.  The ALJ issued his second
decision on August 7, 2000.  Again, he found that Wrenn was not
disabled at any time through December 31, 1996.  The Appeal's
Council denied Wrenn's request for review on July 12, 2004,
making the ALJ's August 7, 2000 decision the final decision of
the Commissioner.  20 C.F.R. § 404.955.

**B.    Education and Work History**

Wrenn was forty-four years old on August 7, 2000.[3]  He
completed the ninth grade and had both carpentry and electrical

---

[3]  Mr. Wrenn was born on August 18, 1955.

vocational training.  Prior to February 11, 1991, his last day of work and the alleged onset date of his disability, he had been employed at various times as a windshield installer, window assembler, truck driver, baker's helper, dishwasher, and injection molding machine operator.

**C.**   **Medical History**

From February 23, 1988, through May 17, 1993, Wrenn was treated by Dr. Garrett Gillespie for injuries and pain in his neck, left hand, and back.  Dr. Gillespie opined on December 11, 1990 that Wrenn should not do any heavy lifting or repetitive bending because of his neck problems.

According to Dr. Gillespie's March 12, 1991 office visit note, Wrenn continued to have neck pain that extended out to his left shoulder.  Dr. Gillespie noted that Wrenn's neck extension and lateral flexion to the left were limited by spasms in the left trapezius muscle group.  Nevertheless, Dr. Gillespie reported that Wrenn's strength was intact, his shoulder motion was good, and his reflexes were symmetrical.  Wrenn continued to experience neck and arm pain for the next two years, as Dr. Gillespie's office visit notes indicate.

Following a May 11, 1993 office visit, Dr. Gillespie reported that Wrenn was able to do light activity, and he encouraged Wrenn to be retrained to do light mechanical repair work.  Dr. Gillespie recommended that Wrenn avoid prolonged bending, lifting, crawling, and climbing, and should not lift more than 15 pounds on a non-repetitive basis.

Wrenn was examined by a neurologist, Dr. Robert Thies, on July 7, 1994.  Dr. Thies noted that Wrenn had a cervical discectomy[4] with fusion in 1988, and that he began experiencing lower back pain after falling while running in the park in 1992. Dr. Thies found that Wrenn's neck movement was limited in all directions, but that the strength in his upper and lower extremities was full and his reflexes were symmetrical.  Because Wrenn experienced discomfort in his lower back when performing a straight leg raise, Dr. Thies ordered a lumbar x-ray and CT scan.

After his July 7, 1994 appointment, Wrenn failed to return to Dr. Thies for a follow-up until February 21, 1996.  Dr. Thies reported that the 1994 CT scan of Wrenn's spine showed some disc

---

[4]  A cervical discectomy is the excision, in part or in whole, of an intervertebral disk of the cervical spine. Stedman's Medical Dictionary 442-43 (25th ed. 1990)("Stedman's").

bulging at L3-4 and L5-S1, but no frank disc herniation.  At this time, Wrenn was taking several medications, including Soma and Aleve for physical pain, and Zoloft for his mood.[5]  Wrenn told Dr. Thies that Zoloft had greatly improved his mood.

When Dr. Thies examined Wrenn in February 1996, he found Wrenn's strength remained excellent in both his upper and lower extremities, but that his neck movement had decreased in all directions.  Dr. Thies thus concluded that Wrenn's discomfort may have resulted from musculoskeletal etiology[6] and prescribed Metaxalone.[7]  Four weeks later, on March 18, 1996, Dr. Thies noted that Wrenn's MRI testing showed mild bulging at C4-5, an apparently stable fusion at C5-6, and disc degeneration at L3-4, but no marked abnormalities in the spinal canal.  Dr. Thies therefore diagnosed Wrenn with cervical and lumbar strain rather

---

[5]   Zoloft is prescribed to treat Major Depressive Disorder. Physician's Desk Reference 2691 (58th ed. 2004)("PDR").  Soma is used as an adjunct to rest, physical therapy, and other measures for the relief of discomfort from musculoskeletal conditions. PDR 1919.

[6]   Musculoskeletal etiology is a disease of the muscles or skeleton.  Stedman's 994, 542 (25th ed. 1990).

[7]   Metaxalone is used as an adjunct to rest, physical therapy, and other measures for the relief of discomfort from musculoskeletal conditions.  PDR 2181.

than discogenic radiculopathy.[8]  He encouraged Wrenn to get
"going on his activities of daily living a bit better" and
scheduled physical therapy.

Wrenn started physical therapy with Lori Le Barnes on April
9, 1996.  At the initial session, he expressed scepticism about
physical therapy, but agreed to try it for one month.  On May 7,
1996, Le Barnes discharged Wrenn from physical therapy because he
was not satisfied with the results.

On September 13, 1996, Wrenn completed an Activities of
Daily Living form.  He indicated that he showered daily, cooked,
walked for 15 to 20 minutes twice each day, and did chores around
the house.  Wrenn also reported that he shopped for groceries
with his wife and daughter, did the dishes, and tried to fix
things around the house.  Wrenn indicated that he had difficulty
concentrating when he was experiencing stress, and that he had
trouble finishing tasks because of the problems with his neck,
arm, and back.  He explained that he had not tried to return to
work because no one would hire him due to his condition.

---

[8]  Radiculopathy is a "disease of the nerve roots."
Dorland's Illustrated Medical Dictionary 1562 (30th ed.
2003) ("Dorland's").

Wrenn was admitted to New Hampshire Hospital on October 1, 1996, after threatening to kill his neighbors and attempting suicide by cutting his abdomen and left hand.  He said that he felt overwhelmed because he did not have enough money for food. Wrenn later explained that he became upset when his treating physician refused to prescribe his medication over the telephone, and he could not get a ride to the doctor's office.  He indicated that this episode was directly related to consuming alcohol.

At New Hampshire Hospital, Wrenn admitted that he had been smoking up to ten marijuana joints per day since he was 12 years old.  He also admitted to having two alcoholic drinks per day. At that time, Wrenn had been taking Zoloft and BuSpar for one year, and reported that these medications were very helpful. However, he was not seeing any mental health counselors and had no past psychiatric admissions.

According to the hospital's intake assessment, Wrenn had a logical and goal directed thought process, clear and normal speech, a depressed mood and angry affect, concrete reasoning, poor judgment, and fair insight.  He exhibited no delusions, hallucinations, suicidal thoughts or plans, or homicidal thoughts or plans.  There was no evidence of cognitive or affective

-8-

disorder, and his level of control was excellent.  Wrenn did not display any symptoms of formal mental illness, and he stated that he was no longer suicidal.  Accordingly, he was discharged on October 4, 1996, and was given a one week supply of Zoloft and BuSpar.  Dr. Howard Suls, Wrenn's treating physician, renewed these prescriptions on October 7, 1996.

At the request of the Social Security Administration, Dr. Burton Nault, a non-examining state agency physician, completed a physical RFC assessment of Wrenn on October 8, 1996.[9]  Dr. Nault determined that Wrenn could occasionally lift 20 pounds, frequently lift ten pounds, stand and/or walk for about six hours in an eight hour workday, sit for about six hours in an eight hour workday, and push or pull without any limitations.  He also determined that Wrenn could occasionally climb, balance, stoop, kneel, crouch, and crawl, but could not perform repetitive overhead reaching.  Dr. Nault thus concluded that Wrenn had the capacity to do light work without repetitive bending, lifting, or overhead reaching.

Similarly, at the request of the Social Security Disability

---

[9]  Dr. Nault's RFC was affirmed by a nonexamining state agency physician on January 28, 1997.

Determination office, psychologist John T. Bourpos, Ph.D.,
completed a consultative evaluation of Wrenn on October 30, 1996.
Dr. Bourpos noted that Wrenn had been on a regimen of Zoloft and
BuSpar for over one year.  According to Dr. Bourpos, Wrenn
claimed that he was unable to return to work because of his
physical limitations.  Upon examination, Dr. Bourpos found
Wrenn had good overall hygiene, was appropriately friendly and
cooperative, with good persistence and patience.  Wrenn was also
found to be alert and responsive, despite an expression that
indicated sadness and depression.  There were no indications of
loose associations, pressured speech, or flight of ideas, and
Wrenn's affect was appropriate.

Dr. Bourpos noted that Wrenn had experienced continuous
depression and feelings of anxiety over the previous six months.
Wrenn told Dr. Bourpos that during this time, he had experienced
depressed moods, loss of interest in activities, feelings of
guilt, motor retardation, sleep disturbances, fatigue, difficulty
concentrating, and diminished libido.  He also reported symptoms
of anxiety, including palpitations, light headedness, sweating,
muscle aches, clammy hands, gastro-intestinal problems, nausea,
muscle twitching, and a dry mouth.  Dr. Bourpos indicated that it

-10-

was unclear whether Wrenn's pattern of anxiety symptoms occurred only during depressive episodes and noted that he wanted to explore this issue further.

Based on these observations, Dr. Bourpos concluded that Wrenn's concentration and attention were mildly impaired and that his short term memory and orientation were intact.  He estimated that Wrenn's intellectual ability is in the low average range and his computational skills are adequate.  Based on this evaluation, Dr. Bourpos reported that Wrenn's mental condition did not appear to interfere with his daily activities, social functioning, or his concentration and task completion.  He used public transportation and telephones, was able to do light chores and could manage his own funds, and was capable of appropriately interacting and communicating with others.  Wrenn also appeared capable of following and completing oral and written instructions of intermediate difficulty.  Nonetheless, Dr. Bourpos concluded that Wrenn's depression, anxiety, and thoughts of self-harm would compromise current vocational functioning and that in a work setting, he would likely have limited attendance, a slow pace, and low energy.  Dr. Bourpos also noted, however, that Wrenn did not report any past difficulties in complying with required

-11-

attendance, work schedules, decision making, or interactions with co-workers or supervisors.

Ultimately, Dr. Bourpos diagnosed Wrenn with Major Depression, recurrent,[10] but ruled out Generalized Anxiety Disorder[11] and Personality Disorder with borderline paranoid features.  He determined that without some form of therapeutic intervention, in addition to medication, Wrenn's prospects for rehabilitation were poor.  Finally, he recommended further evaluation of Wrenn's cognitive functioning and potential for vocational rehabilitation.

On November 19, 1996, Dr. Udo Rauter, a nonexamining state agency psychologist, completed a Psychiatric Review Technique Form ("PRTF") of Wrenn.[12]  Dr. Rauter found that Wrenn suffered

---

[10]   "Major Depression, recurrent," is characterized by the presence of two or more major depressive episodes.  <u>Diagnostic and Statistical Manual of Mental Disorders</u> 376 (4th ed. 2000)("<u>DSM</u>").

[11]   "The essential feature of Generalized Anxiety Disorder is excessive anxiety and worry (apprehensive expectation), occurring more days than not for a period of at least [six] months, about a number of events or activities."  <u>DSM</u> 472 (4th ed. 2000).

[12]   Dr. Rauter's PRTF was affirmed by Dr. Michael A. Schneider, a nonexamining state agency psychologist, on February 28, 1997.

-12-

from severe mental impairments consisting of depression, not otherwise specified, and personality disorder, but that his impairments were not expected to last twelve months.  Dr. Rauter noted that there was insufficient medical evidence to assess whether Wrenn had a medically determinable mental impairment prior to October 1, 1996.  Furthermore, Dr. Rauter opined that Wrenn had only slight restrictions on his activities of daily living and in maintaining social functioning, and that he seldom experienced deficiencies in concentration, persistence, or pace that would result in failure to complete a task.  Finally, Dr. Rauter noted that Wrenn had only one or two episodes of deterioration or decompensation in a work-like setting.

At the request of Dr. Suls, Kathleen C. Leahy, an osteopathic physician, evaluated Wrenn for his neck and back pain on November 25, 1996.  Wrenn denied drinking alcohol, but admitted to smoking between five and ten marijuana joints per day.  Dr. Leahy assessed chronic pain, mostly myofascial[13] in origin, involving the lower cervical and trapezius areas, a

---

[13]  Myofascial pain involves the "sheet or band of fibrous tissue such as lies deep to the skin or forms an investment for muscles and various other organs of the body."  Dorland's at 674, 1213.

history of left biceps tendon injury, generalized musculoskeletal
deconditioning with muscle imbalance and abdominal weakness, and
chronic pain secondary to his conditions.  She indicated that
Wrenn had low motivation to return to work, but nevertheless
recommended that he proceed with a trial of vocational
rehabilitation for a light duty or sedentary position.  Dr. Leahy
further recommended an active rehabilitation program and
encouraged Wrenn to attend, although she was not optimistic that
he would participate.

Dr. Leahy examined Wrenn again on January 10, 1997.  in her
office notes, she reported that he suffered from chronic pain,
including mild myofascial pain in the lower cervical and
trapezius areas.  She assessed lumbar spine degenerative disc
disease without clear findings of radiculopathy and general
muscle deconditioning of the hip and abdominal muscles.
Notwithstanding these findings, Dr. Leahy reported that Wrenn's
attitude had improved and that he was more motivated with a
positive outlook.  Dr. Leahy recommended physical therapy and
again discussed with Wrenn a return to gainful employment.

On June 25, 1997, Dr. Virginia Emery, Ph.D., examined Wrenn
for the first time.  She reported that he suffered from Major

-14-

Depressive Disorder and severe Anxiety Disorder of the Post

Traumatic Stress Disorder subtype.  Dr. Emery opined that Wrenn

had suffered from these disorders for many years, but that their

severity had recently escalated.[14]

**D.**    **Hearing Testimony of Charles Wrenn and Vocational Expert**

        1.   Wrenn's Testimony

        At the July 18, 2000 hearing, Wrenn testified that he

suffered a neck injury at work in 1985, and had surgery on his

neck in 1987.  Wrenn explained that he reinjured his neck while

doing physical labor at Portland Glass, where he was employed as

a windshield, sunroof, and door glass installer, and that he took

Soma for the pain.  Wrenn also reported that he injured his

biceps tendon in 1985, but never had surgery and the injury thus

failed to heal properly.  Wrenn testified that he suffered a back

injury in 1992 when he fell in the park while walking his dog and

---

        [14]  On January 15, 2000, Dr. Emery completed a medical
assessment of Wrenn's ability to do work-related activities.
Based on this assessment, she concluded that he was too
unpredictable and unreliable with respect to rage responses to be
absorbed into the work force.  She reported that he met the full
criteria for Post Traumatic Stress Disorder and that he suffered
from Intermittent Rage Disorder.  Dr. Emery noted that Wrenn was
not actively suicidal and his rage responses were less frequent
due to psychotherapy.  She further concluded that his stability
was dependant upon medication.

that pool therapy improved his back pain.  According to Wrenn,
his back condition remained the same until January 2000, when he
aggravated it in a car accident.

Wrenn explained that he could turn his neck to the right,
but felt pain when he tried to turn it to the left.  Nonetheless,
he was able to cut his neighbor's hedges, take care of her
property, take out her trash, and work on cars at his own pace.

Wrenn testified that he started having trouble dealing with
people the day Portland Glass let him go.  He stated that he
tried looking for work after he lost his job, but was unable to
find anything.  Wrenn explained that he "lost it" when his son
was sent to prison for assault in 1993.  He conceded that he had
a problem with alcohol and had used marijuana, but denied that he
was addicted to either drugs or alcohol.

Finally, Wrenn testified that he began seeing Dr. Emery, a
psychologist, in 1997.  Prior to that, his primary care physician
had prescribed Zoloft and BuSpar for depression and anxiety.  At
the time of the hearing, Wrenn was taking both Zoloft and BuSpar,
as well as Soma and medication for nausea and stomach cramps.
Wrenn stated that when he was off his medication for two weeks in
the fall of 1996, he became very distressed and inflicted wounds

-16-

on himself.  He was ultimately taken to the New Hampshire
Hospital for evaluation.

    2.   <u>Testimony of The Vocational Expert Howard Steinberg</u>

    Vocational expert ("VE") Howard Steinberg testified that
Wrenn's past work as a windshield installer was skilled medium
work, his job as a window assembler was semi-skilled medium work,
his job as a baker's helper was unskilled heavy work, his job as
a truck driver was semi-skilled medium work, his job as an
injection molding machine operator was unskilled light work and
his job as a dishwasher was unskilled medium work.

    The ALJ asked VE Steinberg to assume that an individual of
Wrenn's age, education, and work experience had the following
restrictions: (a) no strenuous lifting and carrying of objects
(limited to twenty pounds maximum lifting but not on a repetitive
or very frequent basis); (b) no reaching over the shoulder more
than periodically (less than one third of the time); (c) no
waiting on the public; and (d) no working in close, critical
situations with other people, such as on an assembly line or
where a great deal of interaction among co-workers is required.
Presented with these limitations, VE Steinberg opined that such
an individual could not perform any of Wrenn's past relevant

work.  VE Steinberg further testified that such an individual could perform other work that existed in significant numbers in the national economy, including security guard at the light duty level, security guard at the sedentary level, courier, and mail clerk.

The ALJ then asked VE Steinberg to evaluate the stress associated with each of the jobs he identified on a scale of 1 to 5, with 1 as the least stressful and 5 as the most stressful. The ALJ explained that he wanted to rule out jobs at levels 4 and 5.  VE Steinberg then testified that all of the jobs he listed were either 2 or 3 on the scale except courier, which, at times, could be at level 4.  He explained that the security jobs he listed did not involve interacting with the public, but instead involved watching space, and that the mail clerk job would not typically involve high stress situations.  VE Steinberg's testimony was uncontradicted.

## II. <u>STANDARD OF REVIEW</u>

After a final decision by the Commissioner denying a claimant's application for benefits, and upon a claimant's timely

request, I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing that decision.  See 42 U.S.C. § 405(g) (2003).  My review is limited in scope, however, as the ALJ's factual findings are conclusive if they are supported by substantial evidence.  See id.; Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam). The ALJ is responsible for making credibility determinations, drawing inferences from the evidence, and resolving evidentiary conflict.  Irlanda Ortiz, 955 F.2d at 769; Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).  I therefore must "uphold the [Commissioner's] findings . . . if a reasonable mind, reviewing evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)(internal quotation marks omitted).

     The ALJ's findings of fact are not conclusive, however, if they are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)(citations omitted).  If the

Commissioner, through the ALJ, has misapplied the law or has failed to provide a fair hearing, deference to the Commissioner's decision is not appropriate, and remand for further development of the record may be necessary.  See Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001).  I apply these standards in reviewing Wrenn's motion to reverse the Commissioner's decision.

### III.  **ANALYSIS**

The Social Security Act defines "disability" for the purposes of Title II as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A) (2003).  When evaluating whether a claimant is disabled due to a physical or mental impairment, an ALJ's analysis is governed by a five-step sequential evaluation process.  See 20 C.F.R. § 404.1520.  An ALJ is required to consider the following issues when determining if a claimant is disabled:  (1) whether the claimant is engaged in substantial

gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents or prevented the claimant from performing past relevant work; and (5) whether the impairment prevents or prevented the claimant from doing any other work.  20 C.F.R. § 404.1520.  An affirmative answer at one step leads to the next step in the analysis.  Id.  If the answer to question (3) or (5) is affirmative, the claimant is disabled. Id.  If the answer to any question other than (3) is negative, the claimant is not disabled.  Id.  The claimant bears the burden on the first four steps.  At step five, the burden shifts to the Commissioner to show "that there are jobs in the national economy that [the] claimant can perform."  20 C.F.R. § 416.920(f); Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991).  The Commissioner must show that the claimant's limitations do not prevent him from engaging in substantial gainful work, but need not show that the claimant could actually find a job.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 276 (1st Cir. 1988).

Here, the ALJ determined at step five that Wrenn was not entitled to benefits because he found Wrenn's residual functional

-21-

capacity allowed him to perform jobs existing in the national economy such as security guard, courier, and mail clerk.  Wrenn now argues that the ALJ (1) failed to consider the combined affect of his physical and mental impairments; (2) erroneously interpreted the medical evidence; and (3) did not properly consider his subjective pain complaints.  I address each argument in turn.

**A.    The Combined Effect of Wrenn's Impairments**

Wrenn first argues that at step three the ALJ failed to consider the combined effect of his physical and mental impairments on his ability to perform substantial gainful work. I disagree.  As a preliminary matter, I note that it is Wrenn's burden to show that he has an impairment or impairments that meet or equal a listed impairment in Appendix 1.  Torres v. Sec'y of Health & Human Servs., 870 F.2d 742, 745 (1st Cir. 1989) (per curiam).  Wrenn has not stated, nor has he otherwise indicated, which listing his impairments purportedly "equal."  See Garcia v. Sec'y Health & Human Servs., 25 F.3d 1037 (1st Cir. 1994)(unpublished table opinion).

In any event, I reject Wrenn's assertion that there is no evidence in the record that the ALJ considered either the

combined effect of his multiple impairments or the medical equivalence of his impairments.  To the contrary, the ALJ specifically concluded in Finding 3 of his August 7, 2000 decision that "[t]he medical evidence establishes that . . . [Wrenn] had depression with symptoms of anxiety, a personality disorder, cervical and lumbar disc disease, impairments which are severe, but which did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P."  Tr. 269.

The ALJ's ultimate conclusion is buttressed by his thorough examination of the record and the questions he directed to VE Steinberg.  For example, the ALJ found that "due to the effects of mental illness, [Wrenn] was unable to deal with the public, perform assembly line tasks, and perform work functions requiring close interaction with co-workers."  Tr. 267.  The ALJ thus determined that Wrenn's "capacity for light work was diminished by significant non-exertional limitations in addition to the prohibition on repetitive overhead reaching and handling."  Tr. 267.  Thus, the record reveals, the ALJ specifically examined the impact of Wrenn's mental impairments on his ability to perform light and sedentary work.

Moreover, the ALJ specifically directed VE Steinberg to consider not only Wrenn's age, educational background, employment history, and the prohibition on overhead reaching and handling, but also his inability to deal with the public, perform assembly line tasks and have close interaction with co-workers.  The ALJ expressly stated that he wanted to excluded from the analysis jobs involving high levels of stress.  Assuming these restrictions, VE Steinberg identified four jobs that Wrenn could perform.  At the ALJ's direction, VE Steinberg testified that all four of the cited jobs involve relatively low stress levels. As these questions clearly indicate, the ALJ properly and reasonably considered the combined effect of Wrenn's physical and mental impairments at step three of his analysis.

**B.    <u>Interpretation of the Medical Evidence</u>**

I also reject Wrenn's argument that the medical evidence submitted by Dr. Emery and Dr. Bourpos support a finding of disability.  With respect to the evidence from Dr. Bourpos, the ALJ properly evaluated his contradictory conclusions.  For example, on October 30, 1996, Dr. Bourpos noted that although Wrenn's depression, anxiety, and thoughts of self-harm would

likely make it difficult for him to cope with work pressures and would compromise his current vocational functioning, he also stated that Wrenn's mental condition did not interfere with his daily activities, social functioning, or his concentration and ability to complete tasks.  Likewise, Dr. Bourpos opined that Wrenn appeared capable of following and correctly completing oral or written instructions of intermediate difficulty, and that his short-term memory and orientation were intact, his thought process was reasonable and coherent, and his persistence and patience were both "good."  Nonetheless, he concluded that without some form of therapeutic intervention, in addition to medication, Wrenn's prospects for rehabilitation were poor.  The ALJ considered this conflicting evidence and reasonably determined that, when viewed in concert with the other medical evidence in the record, particularly Dr. Rauter's November 19, 1996 psychiatric review that classified his impairment as severe but not expected to last 12 months, Wrenn's impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1.  Such a resolution of conflicting medical evidence is properly within the ALJ's province and must not be disturbed where, as here, the resolution is reasonable.

-25-

Furthermore, the ALJ reasonably considered and appropriately declined to accept the record evidence from Dr. Emery because her opinions could not be related to the relevant time period.  Dr. Emery first examined Wrenn on June 25, 1997, nearly six months after his date last insured.  Dr. Emery opined in a July 30, 1997 letter to his attorney that Wrenn suffered from Major Depressive Disorder and severe Anxiety Disorder.  She further opined that Wrenn had suffered from these disorders for several years but that they had recently become more severe.[15]  Dr. Emery did not, however, suggest that Wrenn's impairments were severe during the period prior to December 31, 1996.  Nor did she indicate any restrictions in his daily activities, social functioning, concentration, persistence, or pace.  See 20 C.F.R. part 404, Subpart P, Appendix 1, §§ 12.04B and 12.08B.  I therefore conclude that the ALJ reasonably evaluated the medical evidence in the record for the relevant time period and properly determined that Wrenn's impairments did not meet or equal the

---

[15]   As the ALJ noted in his August 7, 2000 decision, Dr. Emery's January 15, 2000 assessment of Wrenn's ability to perform work-related functions could not be related to his condition on or before December 31, 1996 because it was not supported by any treatment notes in the record during this period.  Tr. 266.

requirements of any impairments listed in the regulations.

**C.   Credibility of Wrenn's Complaints of Pain**

Finally, I reject Wrenn's argument that the ALJ failed to
consider the effect of his subjective complaints of pain on his
ability to work.  In determining the credibility of a person's
statements, the ALJ must consider the entire record, which
includes the objective medical evidence, the individual's
subjective statements about symptoms, information provided by
medical specialists, and any other relevant evidence in the
record.  S.S.R. 96-7(p), 1996 WL 374186 at *1.  A claimant's
subjective statements may suggest a more severe impairment "than
can be shown by objective medical evidence alone."  20 C.F.R. §
404.1529(c)(3).  So long as a credibility determination is
supported by the evidence, the ALJ's determination is entitled to
deference since he observed the claimant, evaluated the
claimant's demeanor, and considered how his testimony
corresponded with the rest of the evidence.  Frustaglia, 829 F.2d
at 195.

In assessing Wrenn's RFC, the ALJ partially credited Wrenn's
subjective complaints concerning his physical limitations and
pain allegations.  Nonetheless, the ALJ reasonably determined

that Wrenn's complaints of symptoms and disabling limitations were not so severe as to render him disabled.  Moreover, because the ALJ did not find Wrenn's statements as to the severity of his symptoms entirely credible, he made "specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]" as required.  Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986).  As the ALJ's decision and the hearing transcript demonstrate, the ALJ properly considered the Avery factors and supported his findings by discussing Wrenn's daily activities, social functioning, and functional abilities.[16]  See Frustaglia, 829 F.2d at 195 (stating an ALJ's credibility assessment is given deference when he "thoroughly questioned the claimant regarding his daily activities, functional restrictions, medication, prior work record, and frequency and duration of the pain . . . in

---

[16]   In Avery v. Sec'y of Health & Human Servs., the First Circuit held that in evaluating a claimant's subjective symptoms, an ALJ must consider (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activity.  797 F.2d at 28-29.

conformity with the guidelines set out in <u>Avery</u> . . . .").  It was therefore reasonable for the ALJ to conclude at step five that Wrenn retained the residual functional capacity to perform both light duty and sedentary work.

### IV.  <u>CONCLUSION</u>

Because I have determined that the ALJ's denial of Wrenn's benefits is supported by substantial evidence, I affirm the Commissioner's decision.  Accordingly, Wrenn's Motion to Reverse (Doc. No. 6) is denied, and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Doc. No. 7) is granted.  The clerk of court shall enter judgment accordingly.

SO ORDERED.


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge


June 27, 2005

cc:  James W. Craig, Esq.
     David L. Broderick, Esq.